Murphy v. Clark.

PETER MURPHY *vs.* WILLIAM CLARK.

From the peculiar character of slave property, a bill in chancery will lie to re-
cover them in specie.[*]

A bill framed with a twofold aspect, either to procure a specific delivery of prop-
erty, or to enforce a supposed lien upon it, is not demurrable for multifarious-
ness.

An administrator sells property of his intestate, at private sale, and takes notes
for the purchase money, payable to himself, and dies before collecting the
amounts of the notes. A bill, filed by the administrator, *de bonis non*, in the
alternative either to have the sale by the first administrator, declared void, and
the negroes delivered to him as the property of the intestate, or in case the
sale is deemed valid, to have the statutory lien enforced to recover the purchase
money—held, to be good on demurrer.

THIS case comes, by appeal, from the superior court of chan-
cery.

William Clark, administrator, *de bonis non*, of all and singu-
lar, &c. of Edwin Perry and Bridges A. Williams, deceased,
filed his bill in August, 1840, in the superior court of chancery
of this State, in which he averred, in substance, as follows:

That Perry & Williams (his intestates,) were partners in
planting, in Hinds county, in this State; that Perry died first,
and Williams subsequently. After their deaths, W. C. Dorsey,
also since deceased, administered on both their estates. As ad-
ministrator, Dorsey came into possession of a quantity of prop-

[*] BY THE REPORTERS. From the following language in Chief Justice Shar-
key's brief opinion in this case, it may be inferred, that, upon this branch of
the case, i. e. whether negroes could, by the aid of a court of equity, be recover-
ed in specie? he differed from Judge Clayton. The question may, perhaps,
therefore, be considered as an open one in this State; as, at the time this case (of
*Murphy* v. *Clark*) was decided, there was a vacancy in the court; Judge Turner
having retired from the bench.

The following is the language of Chief Justice Sharkey, to which we refer:

"If the complainant had relied exclusively on the illegality of the sale to
Cook, I should have been inclined to doubt the propriety of the decree; but he
does not, and although the bill charges that the sale was made without authority,
yet this is not exclusively relied on; it prays, &c." Vide page 237, infra.

erty belonging to the said Perry & Williams, severally, and also joint property of said Perry & Williams. Dorsey did not have either the joint or separate property of said Perry & Williams appraised—he rendered no inventory thereof—he procured no order of sale for the same, or any part thereof.

Amongst the property that came to the possession of the said Dorsey, were the three negroes mentioned in the bill, which negroes were then upon the farm of the said Perry & Williams. Complainant did not know whether they were the joint property of Perry & Williams, or the separate property of Perry, but that they were positively either the one or the other.

In March, 1840, Dorsey sold, or made a pretended sale, of said three negroes, to one Thomas Cook, for $810. The sale was made " without due legal power to do so, in the absence of an appraisment, inventory, order of sale, or other legal requisites," and the negroes were delivered to said Cook, who gave therefor, his promissory note for $810, due six months from the date thereof, with two sureties. Since that time the negroes have passed, with the assent of Cook, into the hands of the appellant, Murphy, in whose possession they remain. Cook and his sureties are entirely insolvent; that Cook, being under prosecution for a high criminal offence, had fled the country; that he had good reason to apprehend that said Murphy, alone, or in conjunction with Cook, if not prevented by appropriate process, will attempt to remove, or cause to be removed from the State, the said negroes, and thereby defeat the statutory lien upon them; or should the sale by Dorsey be declared void, defeat the recovery of the negroes. The bill, after putting some special interrogatories, concludes by praying for an attachment, and general relief.

To this bill the defendant, Murphy, demurred; Chancellor Buckner overruled the demurrer, and the defendant appealed to this court.

*D. Shelton,* for appellant.

The sale to Cook was illegal and void.

" It shall not be lawful for any executor or administrator to dispose of property of an estate, at private sale, except when it

is so decreed by the will of the testator; but in all cases where it may be necessary to sell the whole or any part of the personal estate of any testator or intestate, it shall be the duty of the executor or administrator, to apply to the orphan's court of the proper county, for an order of sale, and upon obtaining the same, to advertise the time and place of such sale, in three or more public places in the county, at least thirty days previous to the day of sale, and then proceed to sell the same at public sale, to the highest bidder, giving at least six months credit, the purchaser giving bond with approved security." H. & H. p 411, § 86.

Now Dorsey, having no other right to the negroes sold than that of administrator, and in that capacity acting strictly as trustee for the creditors and distributees of the estate, a sale made by him was utterly void unless that sale was regulated by the limitations imposed by the authority creating him trustee; that authority is vested under the statutes of the State, of which the above recited section is the one most immediately applicable; but Dorsey sold without conforming to any one of the provisions of that section; that sale was, therefore, void.

This position was expressly decided by this court, in a case identically the same, so far as this question is involved, reported in 1 How. Rep. 539.

Dorsey's sale being void, this conclusion is inevitable; these negroes still constitute a part of the intestate's estate, and may be treated as if such sale had never taken place. This conclusion being correct, is the administrator entitled to a decree making the property liable for the note given for that pretended purchase? That note is itself void, it being given for no consideration, and on an illegal contract. The bill of sale given by Dorsey to Cook is also void, because made without authority of law; therefore Cook owes the administrator nothing, and the administrator owns the property; but the object of enforcing the lien is to pay what Cook owes the administrator—that is, nothing; and this nothing the administrator seeks to make out of his own property, and calls upon this court to aid him to sell the property for this important purpose. Such a proceeding as this

is absurd; such a decree would be ridiculous; under the allegations of the bill, the complainant can do nothing by virtue of the statutory lien.

But the alternative relief is, that the administrator may recover the negroes. In this argument we admit his right to recover, and by the bill, he has, certainly, made out the right without any impeachment or hindrance whatever. The case condensed, is this. Negroes, to which the complainant has, and holds a perfect legal right and title, have unlawfully come into the possession of the defendant, who has and pretends to have, no title thereto; and the question then arises, will the court take jurisdiction of the cause, to restore the possession? It is worthy of remark, that the bill prays for no damages for the detention of the negroes, but only prays for the enforcement of the lien, or the recovery of the negroes, for an attachment, and the general prayer for relief. It would, perhaps, be a tenable position, that, under the general one for relief, damages for detention, or the profits, could not be recovered, and that would leave the bill, as brought, to determine a naked question of possession; but without contesting, on technical rules, I will meet the question of jurisdiction fairly. My positions are,

1. For the purpose of restoring the possession, where legal title is unincumbered, this court has no jurisdiction.

2. Damages for the detention of the property, or the profits thereof, can give no jurisdiction.

3. The court having no jurisdiction of the subject matter of the suit, the statement of facts on which is founded the application for an attachment, does not give this court jurisdiction.

It is a general rule, too well known to require the quotation of authorities, that when there is a full and complete remedy at law, equity will take no jurisdiction of the cause. For the purpose of recovering, the action of *detinue* was, at the time of bringing this suit, a full and complete remedy; that remedy was, at the time, a subsisting remedy—no change of parties was required—no change of the character of the parties was necessary. William Clark, administrator, *de bonis non*, brought this suit. William Clark, administrator, *de bonis non*, would have

brought detinue—this suit is brought to recover the possession from Peter Murphy—that would have been brought for the same object—there is nothing that can be gained here, that could not have been gained by that action. Possession would have been recovered there—possession is sought to be recovered here. Damages for the detention may be sought here—if due they could have been recovered there—the remedy, by detinue, is as broad as any that can be sought here.

To the recovery, both of possession and of damages, for the detention in that action, according to the statements of the complainant's bill, there is and was, when suit was brought, no impediment whatever. Complainant, therefore, had an ample and complete remedy at law; having such, he has no remedy here, unless he brings himself within some one of the exceptions in which there is concurrent jurisdiction; and this brings us to the second position.

2. Damages for the detention of the property, or, in other words, an account of the profits, can give no jurisdiction.

It is true, that accounts form one subject of concurrent jurisdiction of courts of law and equity, but there is a limitation to this; it is not every case where the defendant is indebted to the plaintiff, that forms a proper cause for a bill for an account. There must be mutual demands, accompanied by a series of transactions on both sides, making mutual debts, or debts to one and payments by the other. · 1 Mad. Ch. 86.   6 Vesey, 136. 9 Ib. 473.   2 Johns. Ch. R. 169, 171

In this case the profits constituted but a single charge, not a complication of transactions; that charge is wholly on one side; there are no mutual demands—no payments; they do not, therefore, form such an account as to give concurrent jurisdiction.

In the case of *Livingston* v. *Livingston*, 4 Johns. Ch. R. 290, the court recognizes the principle that rents are recoverable in equity, only when the recovery at law became difficult or doubtful, or there is some impediment to said recovery.   This principle, by analogy, is directly applicable to the position for which I am now contending.   Again, in the case of *North* v. *The Earl of Stafford*, (3 Peere Williams, 148,) on a bill for rents on the

ground of perplexity of title, there was a demurrer, because the remedy was at law. This demurrer was sustained, because, says the court, " the complainant held at law a better remedy for his arrears of rent, than this court could give him; for he might distrain, or bring debt for the arrears of rent due to him." Here there are accounts for rents, similar to the one for profits in the present case, and chancery refuses to take jurisdiction. The true rule is not that rents or profits necessarily give jurisdiction, but when they become complicated by mutual debts, to the one party, and payments by the other, so as to make their accounts cognizable in chancery, then this court will take jurisdiction, and only then; but the profits, in the present instance, do not form such an account, and, therefore, the court can take no jurisdiction for that reason. I now come to my third position.

3. The court having no jurisdiction of the subject matter of the suit, the application for an attachment does not give jurisdiction.

To obtain an attachment in chancery, the same facts must be sworn to as if the application were made in a court of law; both proceedings are under the same statute. If, therefore, the facts which are sworn to in the bill, are sufficient to obtain an attachment in chancery, or an equivalent demand, the same facts would obtain an attachment at law on a legal demand; but where a court of chancery and a court of law have both the power of granting the same restraining writ, or different restraining writs, the restraint must be obtained in that court which has jurisdiction of the subject matter of the suit; thus a *ne exeat* will not be granted by chancery, on a legal demand, where the complainant has the right to demand trial at law. 2 Johns. Ch. R. 169. 1 Ib. 2. 6 Ib. 138. 10 Vesey, 165.

If, therefore, this be a legal demand, the attachment should have been obtained in a court of law; if an equitable demand, it was properly obtained here; but I have already shown it to be a legal demand. The attachment was, therefore, improperly obtained here, and can, therefore, give to this court no jurisdiction.

This court having, therefore, no jurisdiction on the subject matter of the suit, and no jurisdiction, because an attachment is prayed for and obtained, the demurrer, for want of jurisdiction, should be sustained.

*Sloan,* for appellant.

I contend that the decree of the chancellor, overruling the demurrer of the appellant, was properly granted.

If, upon discovery, it should appear that the sale of the slaves to Cook, was strictly legal and valid, then the right of the appellee as administrator, *de bonis non,* to apply for a foreclosure of the statutory mortgage, or of the court of chancery to entertain the application, cannot be doubted. In fact, it seems to be conceded, that, for that purpose, a court of equity would have jurisdiction of the subject matter. And to sustain the demurrer, the ground is assumed that the sale to Cook was wholly irregular, and absolutely void. It will be noticed, however, that this fact was charged upon assurances made at the probate office, not as a fact existing within the knowledge of the appellee, but as one to be divulged more fully by the answer of the defendants to the bill.

The general rule, that where there is a full and complete remedy at law, equity will take no jurisdiction, is admitted. But it is denied that in this case the remedy of the appellee was full and complete at law. The insolvency of Cook and his sureties, is charged in the bill; and the slaves not having been legally disposed of by Dorsey (which is assumed to be the case) remain to be administered. It then becomes the duty of the administrator, *de bonis non,* to collect or reduce to possession, by appropriate means, those slaves. Shall it be insisted that his only remedy is detinue or trover?

Clark charges that he has good reason to apprehend the removal of the slaves. With this apprehension, could he have commenced an action at law, with any degree of safety? Under existing statutes, such removal could not have been prevented by process from a court of law, and a verdict and judgment would probably be fruitless. (The state law, authorizing the recovery of personal property, by an action of replevin, had not been passed when the bill was filed, even admitting that remedy to be appropriate.) A court of chancery could alone afford that remedial process, essential to preserve the property pending litigation. The necessity of discovery, and of restrain-

ing process, it is insisted, furnish ample ground upon which to found the jurisdiction of the court.    See 2 Story's Equity, 130.

An administrator, *de bonis non*, is invested with all the power which the executor, or former administrator possessed; he has the same interest, all the goods, &c., remaining unadministered. He must reduce to possession these specific goods and chattels wherever found.    Toller & of Ex. 240.

An executor or administrator, who has property of the testator or intestate in his hands, is bound to apply that property in the payment of debts and legacies, and to apply the surplus, if any, according to the will, or the statute of distributions.    This is the execution of a trust.    The slaves in controversy passed into the hands of the appellant, bound by a trust.    And a court of equity will compel him to preserve that property for the use of the persons entitled to it, or appoint a receiver to perform that duty.    " Trusts are enforced, not only against those persons who are rightfully possessed of trust property, as trustees, but also against all persons who come into possession of the property bound by the trust.    And whosoever so comes into possession is considered as bound with respect to that special property, to the execution of the trust.    1 Story Eq. 506, 507.    1 Mad, Ch. 466; see also the cases there cited.

Can it be that when goods are sold by an administrator in strict pursuance to the requisition of the law, and they are purchased in good faith, they shall yet be chargeable with the payment of the purchase money; that the absolute title shall never vest in the purchaser, until the payment of the purchase money, and yet, when the sale is wholly irregular, and the purchaser takes the goods with full knowledge of the fact, he shall take them free from the trust, leaving the party entitled to the administration, to a remedy against his person only?    This would be to give the wrong doer a decided advantage over a *bona fide* purchaser.

It is the object of the law to subject the goods, chattels, &c., of the deceased, to the regular course of administration, for the purpose of paying debts, and distributees, &c.    Until that is accomplished, nothing can free such goods and chattels from the trust.

It is upon this principle that a person by seizing upon the personal effects of an intestate, without having first taken out letters, becomes chargeable as executor, *de son tort.*

A receiver will be appointed by a court of equity, to take charge of, and preserve property, even in the hands of an executor, upon affidavit of misapplication and danger to such property. See *Middleton* v. *Dodswell,* 13 Ves. 266.

The subject matter of the suit, then, being trust property, is brought directly within the exclusive jurisdiction of a court of chancery. Trusts constitute one of the ancient heads of equity. 2 Story's Equity, 228, c. 24.

As was before mentioned, the bill has been framed with a double aspect, so as to meet the somewhat uncertain facts of the case, and alternate relief is sought as circumstances may demand.

Suppose the appellee had commenced an action of detinue, believing the sale of the slaves by Dorsey to have been irregular and void; and upon a full disclosure of all the facts, the reverse found to be true? Though the slaves were yet subject to the mortgage, yet would he have failed in his action, and would thus have been compelled at last to seek his remedy in a court of equity. The very uncertainty which envelopes the case, brings it properly within the jurisdiction of the chancery court. And upon a view of all the facts, as charged in the bill, is this not clearly one of those cases, in which, when a party coming properly into equity for a discovery, will not then be turned over to a court of law for relief?

*Clifton,* on the same side.

1. It is a well settled principle, that where the facts stated in a bill, authorize relief of any kind, and there is a general prayer for relief, the court will grant any relief to which the facts stated entitle the party, although not specifically prayed for.

2. If the sale by the first administrator, were made conformably to law, the complainant had a right to go into a court of chancery, to foreclose the mortgage given, by our statute, in such cases.

3. If not so made, the sale and the bill of sale were void, and the court of chancery has power to declare them so, and to order the bill of sale to be cancelled, and the slaves delivered up. Martin & Yerger, 163. 1 Johns. Ch. R. 517. 1 Maddox Chy. 184, &c. Because, the court, having jurisdiction to declare the sale void, will not drive the party to an action at law, and thus be the handmaid of other courts, but will grant relief by ordering a restoration of the property.

4. Upon the authorities in Virginia and Tennessee, recognized by this court, we might contend for jurisdiction upon the peculiar characteristics of the property—being slaves—and, further, that it is *quasi trust* property; but we rely confidently on the general principle—(which clearly embraces this case,) that a court of equity has jurisdiction of all cases, where there is no plain, adequate, and complete remedy at law, or where the remedy in equity is more complete than at law. 1 Story, 53. 1 Howard, 108, 563, 584. 8 Yerger, 502. 10 Yerger, 179. 2 Brockenbrough, 516. 6 Paige, 117.

*D. Shelton*, for appellants in reply.

In answer to my positions, it is urged,

1. That Cook and his sureties are insolvent.

2. That there exists between the master and servants a "*pretium affectionis*," which gives jurisdiction to a court of chancery in the present case.

3. That this is trust property; that Murphy took it subject to the trust, and that because of the fact, chancery has jurisdiction.

To the first of the above positions, I reply, that an action of detinue would not have been brought against Cook and his sureties, but against Murphy, the assignee of Cook and the holder of the slaves. Murphy is not charged to be insolvent: a judgment in detinue would therefore have been good against him.

To the second, I reply, that I fully admit the principle that a "*pretium affectionis*," when it exists, will give jurisdiction to a chancery court. I also admit, that where suit is brought by a member of a family, for the recovery of family slaves, *prima*

*facia*, that *pretium affectionis* does exist. But I also insist that, in the present bill, there is no fact stated, no charge, averment, or intimation urged, tending to establish either the *pretium affectionis*, or the family relation between the complainant and these slaves; upon the contrary, the negative of this is clearly shown. There is no evidence that the complainant ever saw the slaves. He became administrator long after they were sold, and while they were in the possession of either Cook or Murphy. There is no evidence of such a relation between the heirs of the intestate and the slaves. It is not shown who are those heirs; they may be total strangers to the slaves—distant relations of the intestate—and, constructively, they are strangers to the slaves, for all presumptions are strongest against the pleader.

There existing then no such relation, equity will not for that reason take jurisdiction. See 4 Yer. 84. 3 Rand R. 170. 6 Rand R. 194, 506. 4 How. R. 455.

To the third position, I reply, admit that Dorsey, the original administrator, held the slaves as a trustee for the creditors and heirs of the intestate—admit that this trust adheres to the slaves in the hands of Murphy, and we have Murphy trustee, the heirs and creditors *cestque trust.* Or say that by succession in the administration the legal title to the slaves is in Clark as trustee, and we have Clark trustee, the heirs and creditors *cestque trust.* Upon either hypothesis the relation of trustee and *cestque trust* does not exist between Murphy and Clarke; between them, therefore it is strictly a conflict of title without in any manner involving the trust. But the reason of chancery jurisdiction in matters of trust is this, that there exists that privity of estate between the contending parties, that one cannot sue the other; that principle is therefore confined to contests between trustees and *cestque trust ;* and then the jurisdiction is conclusive. Where the trustee sues a third person, or a third person the trustee, the jurisdiction is independent of trust, although the controversey may relate to the trust property. 2 Atk. 612. 4 Coke's Inst. 85. Such is the present case, and that jurisdiction is in a court of law.

Mr. Justice CLAYTON delivered the following opinion.

This was a bill filed by Willian Clark, as administrator, *de bonis non*, of Edwin Perry and Bridges Williams, to recover three slaves from the defendant.   The two decedents had been in partnership in carrying on a plantation in Hinds county; one Vernon Dorsey became the administrator of both of them, but he failed to return in either an inventory of appraisement, and without any order of the probate court, sold the slaves in controversy to one Thomas Cook, at private sale, and took his note, with security, for the purchase money.   Cook and his sureties, all proved insolvent; and Cook absconded from the country, leaving the negroes in the possession of the defendant, who appears to be only a bailee.   The bill alledges that Clark, the administrator, was not familiar with the business of the decedents, and did not know whether the slaves belonged to Edwin Perry, alone, or formed a portion of the partnership effects; nor did he know whether the sale was intended to be valid and *bona fide* by the previous administrator, or a sham and pretended sale.

Under these circumstances the bill was filed, praying a disclosure from the defendant, as to the real nature of the sale; and, if it were a sham or void sale, praying a decree for the slaves, but if a valid sale, then seeking to enforce the equitable statute mortgage for the payment of the purchase money.   It also prayed for an attachment and injunction to prevent the removal of the slaves.

To this bill the defendant demurred, and assigned, as causes of demurrer, first, the want of equity upon the face of the bill, and, second, the want of jurisdiction in the court.   The demurrer was overruled by the chancellor, and the defendant directed to answer; from which order he appealed to this court.

The two objections may be considered together, for they, in truth, resolve themselves into the single question of jurisdiction.

The great objection, urged to the exercise of jurisdiction by the chancery court, is, that there is ample and complete remedy at law, and that the bill does not disclose those circumstances which are necessary to authorize the interposition of equity, or in the technical phrase of the books, the *pretium affectionis* is

not set forth. It will be borne in mind that slavery, as it exists with us, was unknown to the English system of laws; it will be in vain, therefore, to look into the English reports for precedents. For this reason it is not surprising, when we look into the American cases, that some conflict of views should be found to exist, since principles, intended originally for a different subject matter, have to receive a new application. Some of the courts have accordingly holden, that peculiar circumstances must be shown to exist, to give a court of equity jurisdiction in regard to this species of property; others, that from the very nature of the property itself, chancery is authorized to interfere. Of the former class, are the decisions referred to in argument from the Virginia books; of the latter, are those to be found in the Tennessee reports.

In *Loftin* v. *Espy*, 4 Yerger, 84, the principle is distinctly asserted, that to give a court of equity jurisdiction in regard to slaves, it is not necessary that any other cause should be stated in the bill and proven, than a right of property.

In *Henderson* v. *Vaulx and Wife*, 10 Yerger, 37, Judge Reese, in the opinion of the court, holds the following language: "It is but recently, in this State at least, that the peculiar nature and character of slave property, and of the relation between master and slave, have been regarded in our courts, in the spirit of a rational and humane philosophy. A few years ago, and any man who had a judgment debtor, might, by virtue of an execution against him, become the owner of a slave of a third party, if he chose in a suit at common law to pay the value, or more than the value. A court of chancery, if the owners had there sought to restrain the sale or recover the possession, closed its doors upon him with the information that he had a clear and unembarrassed remedy at law. Afterwards it was discovered, as wines, family pictures, plate and ornamental trees, &c., were protected to the owner in a court of chancery against trespass, so might a slave, if a family slave, and a peculiar favorite with his master. But recently, upon grounds far less technical and far higher and sounder, it has been determined that a court of chancery will protect the possession and enjoyment of this peculiar property—a property

in intellectual and moral and social qualities—in skill, fidelity
and gratitude, as well as in their capacity for labor; and any
owner may now say and show to a court of chancery, I am
master, this is my slave, and he shall retain or recover the pos-
session." The same course of reasoning and of decision prevails
in South Carolina. Judge Harper, in delivering the opinion of
the court in *Horsy* et al. v. *Glover* et al. says, "I am of opin-
ion, in pursuance of the views in *Sarter* v. *Green*, 2 Hill, 136,
that when a man states that his slaves have come into the pos-
session of another, who refuses to deliver them, or that he has
contracted for the purchase of specific slaves, and the vendor
refuses to perform his contract, he states a sufficient ground of
equity jurisdiction. When there is a complicated question of
title—when there is much conflicting testimony, or, more es-
pecially, when the credit due to testimony is to be weighed, a
jury is the proper tribunal for the trial of those questions. In
such case an issue should be directed." 2 Hill's Ch. Rep. 524.
In North Carolina a similar decision has been made. 3 Murphy,
74. Kentucky seems to have followed the decisions in Virginia;
but I think the other rule is supported by the weight of authority.

I have carefully examined the leading cases in the English
chancery books on this question of the jurisdiction of equity to
compel the delivery of a personal chattel in specie. In not one
of them does it appear that the bill in terms contained an alle-
gation of the *pretium affectionis*. In the celebrated Pusey horn
case, 1 Vim. 272, the bill was demurred to, because, by his bill,
the complainant did not pretend to be entitled to the horn, eith-
er as executor or devisee, nor had he charged it to be an heir
loom. The demurrer was overruled, and the lord keeper added,
that if the land was held by the tenure of a horn, or cornage,
the heir would be well entitled to the horn at law. The *Duke
of Somerset* v. *Cooksen*, 3 P. Wms. 390, was a bill filed for a
silver altar, remarkable for a Greek inscription and a dedication
to Hercules. The Duke became entitled to it as a treasure trove
in his manor, and filed his bill to recover it undefaced. It does
not appear that he had ever been in possession of it, and no
*pretium affectionis* was alledged. There was a demurrer to the

bill, which was overruled. It is said, in that case, " that nothing can be more reasonable than that the man, who, by wrong, detains my property, should be compelled to restore it to me again in specie; and the law being defective in this particular, such defect is properly supplied in equity." The case of *Fells* v. *Read*, 3 Vesey, was for a silver tobacco box and its envelopes, which were adorned with several engravings of public transactions, and heads of distinguished persons. The bill was sustained, and is subject to the remarks just made in reference to the case last cited. So of *Macclesfield* v. *Davis*, 3 Ves. & Beame.

These cases, to my apprehension, establish the principle, that wherever the bill states circumstances, from which the court may fairly infer that the owner prefers the property in specie to damages, and that this preference is of a character which it is not unreasonable to indulge, and exists in reference to property for which damages at law might not be a full compensation, equity will entertain jurisdiction.

I recollect a case in my practice, in which a bill was filed to recover what is called a *mad stone*; that is, a stone supposed to be a specific and talisman against the bite of all poisonous and rabid animals. There was a legend connected with it, as romantic as that attached to the " Lee-penny" in Scott's beautiful novel of the Talisman. A British soldier, who had served in the East Indies, was wounded during our revolutionary war, and fell into the hands of one of the planters in Carolina. He had this stone with him, which he had procured in the East Indies, and when he was about to die, in acknowledgment of the kind treatment he had received, he gave it to his host, with an account of its virtues. He represented it to be a certain cure for the bite of all rabid and venomous animals, and had borne it with him in all his wanderings. The stone is still kept in this State, and used for the purposes for which it was recommended. It could not well be said that a man had a peculiar affection for this stone, and yet it will scarcely be doubted, that, whether its extraordinary properties be real or imaginary, the true owner would have, in equity, a right to recover it in specie.

Upon principle and authority, I am, therefore, of opinion, that,

from the peculiar character of slave property, a bill will, in all cases, lie to recover them in specie, unless, perhaps, in the case stated as an exception, in 2 Hill, 525, in which the owner has treated them as merchandise, and bought with a view to sell again.

There is another view of this case, which, to my mind, is conclusive. The administrator is but a trustee for the creditors and distributees of a decedent. He is obliged to administer the effects left by the intestate for their benefit, in the manner prescribed by law. Our statute has directed that the slaves of an intestate shall be sold in one way only, and that is by order of the probate court. If the administrator has to bring suit for slaves, and he institutes an action at law, he may not get the slaves, but only damages. When the defendant pays the damages, the property is changed, and the title is vested in him ; even if the change of the title does not take place by the verdict and judgment. Here, then, is a way of altering the title, certainly not within the contemplation of the statute. The administrator is afterwards not administering the estate of the decedent, for the slaves form, in this instance, the estate, but something taken in lieu thereof. Not taken, either, at a price agreed to by the administrator, nor yet at a price fixed by public sale—the fairest criterion of value—but at an estimate placed upon it by third persons—a jury. This is all arbitrary, and does not secure a just administration of the estate. But if he is permitted, in equity, to recover the property in kind, he can carry out the terms of the trust, in the precise manner prescribed by the statute. To secure this end, it is proper to sustain the jurisdiction in chancery.

This bill is filed with a double aspect, either to recover the property, or to enforce the statutory lien upon it, as to the court may seem right. The administrator could not know but there would be a controversy for the property, nor how that controversy would result. His object, therefore, was to prevent a multiplicity of suits, and to have the whole matter brought to a speedy adjustment.

The bare fact of an outstanding title, gives a right to go into

equity, to have it put out of the way, and the muniment by which it is evidenced, cancelled, upon a proper showing, and the cloud or obstruction, removed. It was proper, therefore, for the administrator to have the doubt created, even by a pretended or void sale, removed, so that no embarrassment might exist in the discharge of his duties.

I cannot doubt that, upon various grounds, the court of chancery had jurisdiction, and am of opinion that the decree should be affirmed.

Mr. Chief Justice Sharkey delivered the following opinion:

I concur in sustaining the decree of the chancellor, overruling the demurrer, for the following reasons. The bill is in the alternative, and seeks relief on either one of two grounds; first, that the sale made by Dorsey, the first administrator to Cook, was void, and did not divest the right of property in the slaves; and that the complainant, as administrator, *de bonis non*, is entitled to them as a part of the administered assets of the estate. And, second, that in case the sale should turn out to be valid, then the bill seeks to enforce the equitable mortgage given by law, to secure the purchase money. The latter ground is clearly one for equity cognizance, although the first may not be so; and it is a rule, sanctioned by reason, that where the bill seeks relief on several equitable grounds, and the complainant is entitled to relief on one of them, although he may not be on the others, the defendant cannot demur; for, by doing so, he admits a ground of relief. If the complainant had relied exclusively on the illegality of the sale to Cook, I should have been inclined to doubt the propriety of the decree; but he does not; and although the bill charges that the sale was made without authority, yet this is not exclusively relied on; it prays a disclosure of the fact, whether the sale was illegal or not, and if legal, then it prays that the lien may be enforced. At the hearing it may turn out to be a valid sale, and then the chancellor can give such relief as the complainant may be entitled to, or refuse any relief if he is entitled to none. See *Western Insurance Company* v. *The Eagle Fire Insurance Company*, 1 Paige, 284.